Linda A. PALMER, Personal Representative of the Estate of Harlan Hunt Palmer, Appellant–Plaintiff,

v.

COMPREHENSIVE NEUROLOGIC SERVICES, P.C. and Mark A. Muckway, M.D., Appellees–Defendants.

No. 32A01–0512–CV–553.

Court of Appeals of Indiana.

April 20, 2007.

Michael S. Miller, Catherine A. Kling, Miller Muller Mendelson & Kennedy, Indianapolis, IN, Attorneys for Appellant.

Roger K. Kanne, David D. Becsey, Ziegler Cohen & Koch, Matthew W. Conner, Tabbert Hahn Earnest & Weddle, LLP, Indianapolis, IN, Attorneys for Appellees.

## OPINION

SULLIVAN, Judge.

Appellant–Plaintiff, Linda Palmer ("Palmer"), Personal Representative of the Estate of Harlan Hunt Palmer, appeals following her medical malpractice action in which the jury awarded damages and the court permitted setoff, resulting in a zero-dollar judgment against Appellees–Defendants, Comprehensive Neurologic Services, P.C. ("CNS") and Mark A. Muckway, M.D. ("Dr.Muckway"). Upon appeal, Palmer claims that the trial court (1) erred in granting the defendants' post-trial motion to correct error requesting setoff as to Palmer's settlements with other non-health care provider defendants; (2) abused its discretion in refusing to award additur or grant a new trial on the issue of damages; and (3) erred in failing to award her pre-judgment interest.

We affirm.

On June 1, 2000, Palmer's husband, Harlan Hunt Palmer, who was forty-four, visited his family physician with complaints of, among other things, dizziness, fatigue, and flu-like symptoms. Palmer testified that her husband, who at the time had just won a local primary in his bid for Hendricks County Commissioner, had begun sleeping a great deal, was losing his balance, was losing weight, and appeared to be cold all of the time, even on warm days. Mr. Palmer's physician scheduled a Magnetic Resonance Imaging (MRI) and referred Mr. Palmer to Dr. Muckway of CNS.

Mr. Palmer visited Dr. Muckway at CNS on June 14, 2000 with symptoms of double vision, difficulty speaking, general weakness, memory loss, and fatigue. Dr. Muckway ordered a lumbar puncture for purposes of finding markers of multiple sclerosis or any other condition. On June 22, 2000, Dr. Muckway saw Mr. Palmer again and placed him on Betaseron, a drug used to treat multiple sclerosis which modulates or suppresses the immune system. On July 6, 2000, at approximately 7:00

p.m., Mr. Palmer took his first dose of Betaseron.

Palmer testified it was her understanding that Betaseron therapy would cause flu-like symptoms. According to Palmer, by the next day, July 7th, Mr. Palmer felt sick, was sensitive to light, and had double vision. On the evening of July 7th, Palmer called a Betaseron hotline and, according to Palmer, was told that Mr. Palmer was suffering the effects of starting the medication. On the morning of July 8, Mr. Palmer began having seizures. Mr. Palmer was immediately transported by ambulance to Hendricks Community Hospital. According to emergency-room physician Dr. Raymond Piedmonte, when Mr. Palmer arrived at the hospital he was in status epilepticus, meaning he was experiencing a continued seizure for more than thirty minutes, or repeated seizures, without regaining a full level of consciousness. Dr. Piedmonte testified that medics had administered Valium but that it appeared to have no effect on the status epilepticus. To assist in Mr. Palmer's treatment, Dr. Muckway arrived at the emergency room within approximately twenty minutes of Mr. Palmer's arrival. According to Dr. Muckway, despite treatment, Mr. Palmer remained in a state of intractable status epilepticus. On July 9, 2000, Mr. Palmer was transferred to Indiana University Hospital under the care of Dr. Karen Roos. It was the opinion of Dr. Roos that Dr. Muckway had not followed the customary protocol for treatment of status epilepticus. Mr. Palmer died on July 10, 2000.

An autopsy conducted by Dr. Biagio Azzarelli demonstrated that Mr. Palmer had a disease of the brain consistent with viral encephalopathy caused by a herpes family virus. Dr. Azzarelli found no evidence of multiple sclerosis. Dr. Azzarelli testified, however, that a patient could suffer from multiple sclerosis and viral encephalitis at the same time and that he could not conclude to a reasonable degree of medical certainty that Mr. Palmer did not have multiple sclerosis.

On September 6, 2001, pursuant to Indiana Code § 34–18–8–4 (Burns Code Ed. Repl.1998), Palmer filed a Proposed Complaint for Damages against CNS and Dr. Muckway before the Indiana Department of Insurance, Patient's Compensation Fund. On February 18, 2004, the Medical Review Panel issued its opinion that there was a breach in the standard of care in the management of the status epilepticus, but that there was not a breach in the standard of care in the evaluation and diagnosis of multiple sclerosis.

Prior to the Medical Review Panel's decision with respect to CNS and Dr. Muckway, on July 8, 2002, Palmer filed a complaint in federal court against multiple out-of-state non-health care providers allegedly associated with incidents leading to Mr. Palmer's death. On April 4, 2003 Palmer filed a second amended complaint in federal court naming an additional party. Following the Medical Review Panel's decision, Palmer filed a complaint against CNS and Dr. Muckway in Hendricks Circuit Court on May 6, 2004. On May 18, 2004, Palmer moved in federal court to join the non-diverse qualified health care providers, CNS and Dr. Muckway, pursuant to Indiana Code § 34–51–2–18(c) (Burns Code Ed. Repl.1998) and to remand and consolidate all claims and defendants to state court. Palmer's motion to join the non-diverse health care provider defendants was granted, and the federal court, finding that it no longer had jurisdiction, ordered on July 2, 2004 that the case be remanded and consolidated with the case against CNS and Dr. Muckway pending in Hendricks Circuit Court.

On July 15, 2004, Hendricks Circuit Court permitted Palmer to file an amend-

ed complaint joining additional defendants previously named in the federal action.[1] On November 1, 2004, Palmer moved for summary judgment against CNS and Dr. Muckway on the issues of liability and causation. The trial court denied the motion on December 10, 2004. On June 13, 2005, Palmer settled with one of the non-health care provider defendants, and that defendant was dismissed with prejudice from the case. On September 6, 2005, the day of trial, Palmer settled with the other non-health care provider defendant, and that defendant was also dismissed with prejudice from the case.[2]

That day, September 6, 2005, the case proceeded to trial. On September 21, 2005, the jury rendered a verdict in favor of Palmer, awarding her $375,000 in damages. On September 30, 2005, CNS and Dr. Muckway, in support of a subsequently filed motion to correct error,[3] filed a brief requesting that the damages assessed against them be set off by the amounts received in settlement from the two non-health care providers[4] and opposing any request by Palmer for prejudgment interest. On October 3, 2005, Palmer responded by requesting that the court deny any setoff, grant additur or a new trial on the issue of damages, and order prejudgment interest. In a November 10, 2005 ruling, the trial court denied Palmer's request for additur or a new trial on the issue of damages, granted the defendants' requested setoff, denied Palmer's request for prejudgment interest, and entered judgment

against CNS and Dr. Muckway in the amount of $0. Palmer filed her notice of appeal on December 9, 2005.

Upon appeal, Palmer claims the trial court erred in granting CNS and Dr. Muckway a setoff against the damages assessed to them by the jury. Palmer also claims that the trial court abused its discretion in denying additur or a new trial on damages and that it further erred in denying prejudgment interest.

### I. Setoff

#### A. Comparative Fault Act

Palmer first argues that the Comparative Fault Act, Indiana Code § 34–51–2–1 et seq. (Burns Code Ed. Repl.1998), applies to medical malpractice cases involving litigation such as hers in which qualified health care providers are joined as codefendants with non-qualified health care providers. Palmer further argues that pursuant to *R.L. McCoy, Inc. v. Jack,* 772 N.E.2d 987, 991–92 (Ind.2002) and *Mendenhall v. Skinner and Broadbent Co., Inc.,* 728 N.E.2d 140, 145 (Ind.2000), which interpret the Comparative Fault Act, setoff credits from settling parties are impermissible. CNS and Dr. Muckway respond that, under its plain language, the Comparative Fault Act and its non-party defense requirements do not apply to the case at hand and that they are entitled to setoff under the long-standing Indiana common law principle of "one satisfaction." CNS and Dr. Muckway further claim that it is disingenuous for Palmer to argue that

---

1. It appears that multiple non-health care provider defendants were named in the federal action, but when the case was consolidated with the State action, only two such defendants were named.

2. This appeal was filed under seal, so the settling parties and terms of their settlements have purposefully been omitted from this opinion.

3. Although not bearing a file mark, the motion to correct error was served upon counsel of record on October 11, 2005.

4. As the sum of such settlements exceeded the damages assessed by the jury against CNS and Dr. Muckway, CNS and Dr. Muckway requested that the court enter judgment against them in the amount of $0.00.

the requirements of the Comparative Fault Act apply because Palmer's theory of recovery against them was never alleged to be one of comparative fault.

Indiana Code § 34–51–2–1 provides the following in pertinent part:

"(b) This chapter does not apply to an action:

(1) brought against a qualified health care provider under ...

IC 34–18 for medical malpractice...."

In spite of this stated exception regarding medical malpractice claims, Indiana Code § 34–51–2–17 and –18 make specific provision for medical malpractice claims under the comparative fault scheme. Indiana Code § 34–51–2–17 (Burns Code Ed. Repl. 1998) provides for nonparty defense claims in medical malpractice actions as follows:

"This section applies to a claim filed with the insurance commissioner under ... IC 34–18 against a qualified health care provider, with the exception that the pleading of a nonparty defense, as required by sections 15 and 16 [IC 34–51–2–15 and IC 34–51–2–16] of this chapter must occur not later than ninety (90) days after the filing of the claim with the insurance commissioner. However, this time limitation may be enlarged or shortened by a court having jurisdiction over the claim in such matter as will give:

(1) the qualified health care provider reasonable opportunity to discover the existence of a nonparty defense; and

(2) the claimant reasonable opportunity to assert a claim against the nonparty before the expiration of the period of limitation applicable to the claim."

Indiana Code § 34–51–2–18 (Burns Code Ed. Repl.1998) provides for joinder of medical malpractice claims as follows:

"(a) This section applies to an action based on fault that is brought by the claimant against:

(1) one (1) or more defendants who are qualified health care providers under IC 34–18; and

(2) one (1) or more defendants who are not qualified health care providers.

(b) Upon application of the claimant, the trial court shall grant reasonable delays in the action brought against those defendants who are not qualified health care providers until the medical review panel procedure can be completed as to the qualified health care providers.

(c) When an action is permitted to be filed against the qualified health care providers, the trial court shall permit a joinder of the qualified health care providers as additional defendants in the action on file against the nonhealth care providers."

The Comparative Fault Act applies generally to damages actions based in fault that accrued on or after January 1, 1985. *Mendenhall*, 728 N.E.2d at 142. The primary objective of the Act was to modify the common law rule of contributory negligence under which a plaintiff was barred from recovery where he was only slightly negligent. *Id.* The Act seeks to achieve this result through proportional allocation of fault, ensuring that each person whose fault contributed to cause injury bears his or her proportionate share of the total fault contributing to the injury. *Id.* Under Indiana's comparative fault scheme, a named defendant may assert a "nonparty" defense, seeking to attribute fault to a nonparty rather than to the defendant. *Id.* (citing Ind.Code § 34–51–2–14 (Burns Code Ed. Repl.1998)). When a defendant asserts this defense, the court instructs the jury to determine the percentage of fault of each party and " 'any person who is a nonparty.' " *Id.* (quoting Ind.Code

§ 34–51–2–7(b)(1) (Burns Code Ed. Repl. 1998)). A nonparty is: " 'a person who caused or contributed to cause the alleged injury, death, or damage to property but who has not been joined in the action as a defendant.' " *Id.* (quoting Ind.Code § 34–6–2–88 (Burns Code Ed. Repl.1998)). A defendant must affirmatively plead the nonparty defense, and the defendant carries the burden of proof on the defense. *Id.* (citing Ind.Code § 34–51–2–15).

▆▆▆ In cases where the Comparative Fault Act applies, a litigating defendant who fails to add a settling defendant as a nonparty pursuant to the provisions of the Act may not seek credit for money paid by the settling co-defendant. *Mendenhall,* 728 N.E.2d at 145. Even where settling co-defendants are named as nonparties pursuant to the terms of the Act, a litigating defendant may not seek credit for settlement payments by those nonparty defendants. *R.L. McCoy, Inc.,* 772 N.E.2d at 988.

▆▆▆ In medical malpractice actions, however, the Comparative Fault Act does not apply. *Cavens v. Zaberdac,* 849 N.E.2d 526, 529 (Ind.2006) Under Indiana law, the historic common law defense of contributory negligence remains available to defendants in cases alleging medical malpractice. Id.

▆▆▆ In examining a statutory provision, we look at the statute as a whole and give common and ordinary meaning to the words employed. *Mendenhall,* 728 N.E.2d at 142. It is well settled that the legislature does not intend by a statute to make any change in the common law beyond what it declares either in express terms or by unmistakable implication. *Indianapo-*

*lis Power & Light Co. v. Brad Snodgrass, Inc.,* 578 N.E.2d 669, 673 (Ind.1991) (interpreting the Comparative Fault Act). As a statute in derogation of the existing common law, the Act must be strictly construed. *Id.*

We recognize that I.C. § 34–51–2–17 provides for the pleading of a nonparty defense in medical malpractice actions and that I.C. § 34–51–2–18 provides for the delay of an action against non-health care providers and the subsequent joinder of health care provider claims to that pending action. While it may seem inconsistent that the Act both denies its application to medical malpractice claims and at the same time makes provision for such claims, the provisions it does make are procedural, and we will not infer from these procedural provisions that the substance of the claims against the health care providers is similarly affected by the Act.[5] To the contrary, the plain language of I.C. § 34–51–2–1 states that it is not. Given the established common law regarding the inapplication of comparative fault to medical malpractice actions and our burden to strictly construe the Act, we will not find that the mere mention of medical malpractice by the Act overrides the common law and the plain language of the Act by placing medical malpractice claims substantively within its purview. Indeed, we have determined in the past that the joinder of certain nonparties, while provided for as a procedural matter in the Act, is nevertheless impermissible if it contravenes the substantive common law principles against joining such parties. *Edwards v. Sisler,* 691 N.E.2d 1252, 1254–55 (Ind.Ct.App. 1998) (citing *Holden v. Balko,* 949 F.Supp. 704, 709–14 (S.D.Ind.1996)).

5. Indeed, "mixed theory" cases due to the application of the Act to some claims and not to others have previously been addressed, as noted in *Templin v. Fobes,* 617 N.E.2d 541, 544 n. 1 (Ind.1993), *cited* in *Penn Harris Madison School Corp. v. Howard,* 861 N.E.2d 1190, 1193 n. 3 (Ind.2007).

Furthermore, we find it purely academic to engage in an analysis of the Act and whether it could or could not apply to the case at hand because, regardless of whether Palmer could have proceeded to trial seeking a verdict under a comparative fault analysis,[6] she never sought to do so. To the contrary, Palmer's theory of recovery against CNS and Dr. Muckway was, from the outset, joint and several liability. We observe that Palmer's complaint against CNS and Dr. Muckway alleges joint and several liability only. Further, in the parties' preliminary theories of the case, submitted September 3, 2004, Palmer makes no mention of comparative fault on the part of CNS and Dr. Muckway, and both CNS's and Dr. Muckway's stated defenses included contributory negligence.[7] As CNS and Dr. Muckway point out, Palmer's objections to their proffered jury instructions on contributory negligence were upon causation grounds and made no mention of comparative fault. Moreover, Palmer tendered jury instructions alleging joint and several liability, the jury was instructed accordingly, and the verdict form indicated the amount of damages only, with no apportionment of fault. Having settled her claims against the non-health care providers and proceeded to trial upon the sole theory of medical malpractice joint and several liability, Palmer may not now rely upon those past claims in order to transform the jury verdict into an apportionment of damages under the several liability scheme of the Comparative Fault Act.

### B. *Common Law*

■ As this was a verdict based upon medical malpractice principles, we must analyze the setoff according to such principles. Palmer's common-law challenge to the trial court's grant of setoff alleges that CNS and Dr. Muckway failed to satisfy their burden to prove double recovery in what Palmer claims is a "successive tortfeasor" case.

■ A trial court has the power and duty to reduce jury verdicts by amounts received in settlement to ensure that a plaintiff not receive more than a full recovery. *Huffman v. Monroe County Cmty. Sch. Corp.*, 588 N.E.2d 1264, 1267 (Ind. 1992). Because the settlement credit is in the nature of an affirmative defense on the issue of damages, the defendant who seeks to take advantage of this credit bears the burden of proving the amount of the credit to which he is entitled. *Riehle v. Moore*, 601 N.E.2d 365, 371 (Ind.Ct.App.1992), *trans. denied.* In reviewing the trial court's judgment permitting setoff, we consider the evidence in the light most favorable to the defendants together with all the reasonable inferences to be drawn therefrom. *Marquez v. Mayer*, 727 N.E.2d 768, 773–74 (Ind.Ct.App.2000), *trans. denied.*

■ When the actions of multiple defendants cause a single injury to a plaintiff, a defendant against whom judgment is rendered at trial is entitled to a setoff against the assessed damages in the amount of any funds the plaintiff received from any settling joint tortfeasor. *Marquez*, 727 N.E.2d at 774. Joint tortfeasors are those whose actions unite to cause a single injury. *Id.* This credit is allowed in order to prevent a plaintiff from recover-

---

**6.** This, of course, with respect to CNS and Dr. Muckway, would directly contradict I.C. § 34–51–2–1.

**7.** While the Act contemplates the plaintiff's fault as well, such fault is termed "contributo-

ry fault" rather than "contributory negligence" as it is termed under the common law analysis. *See* I.C. § 34–51–2–6 (Burns Code Ed. Repl.1998).

ing twice for the same injury. *Id.* As our Supreme Court outlined in *Mendenhall,* 728 N.E.2d at 141, Indiana courts have traditionally followed the "one satisfaction" principle, meaning that courts should take account of settlement agreements and credit the funds received by the plaintiff through such agreements, pro tanto, toward the judgment against the co-defendants.

In permitting the setoff requested by CNS and Dr. Muckway, the trial court stated simply, "The Jury having found for the Plaintiff and against the Defendant, Mark A. Muckway, MD, in the amount of $375,000 and the settlement contributions having exceed[ed] that amount, the Court must deny Plaintiff's Motions and enter a judgment on behalf of the Plaintiff and award damages of $0." Appellant's App. at 123.

■ In support of her claim that the trial court erred in permitting setoff, Palmer refers to *Depew v. Burkle,* 786 N.E.2d 1144 (Ind.Ct.App.2003) and *Marquez,* 727 N.E.2d at 774, claiming that the defendants in her case were successive tortfeasors rather than joint tortfeasors and her recoveries from each of them should not be set off against one another. Successive tortfeasors are distinguishable from joint tortfeasors in that their respec-

tive negligent acts are independent of one another and produce different injuries. *Depew,* 786 N.E.2d at 1147.

■ In both *Depew* and *Marquez,* however, the plaintiffs claimed successive injuries, one initial injury involving a broken bone, and a subsequent second injury as a result of allegedly negligent medical treatment. *Depew,* 786 N.E.2d at 1150–51; *Marquez,* 727 N.E.2d at 774. Here, in the light most favorable to the defendants, the record supports the trial court's finding that there was in fact only one injury, namely Mr. Palmer's death.[8] In her pleadings against the non-health care providers in federal court, as well as in her July 14, 2004 amended complaint against CNS, Dr. Muckway, and the non-health care providers in Hendricks Superior Court, Palmer alleged only the injury of Mr. Palmer's death and claimed damages directly resulting from the acts or omissions which caused his death.[9] Palmer cites us to no authority suggesting that the single injury of death shall constitute separate injuries when occasioned by multiple tortfeasors. Indeed, the law appears to be to the contrary, namely that when multiple tortfeasors cause a single injury to a plaintiff, they are deemed "joint tortfeasors," and setoff is permissible. *Marquez,* 727 N.E.2d at 774.

---

8. While Palmer argues that there was a continuum of Mr. Palmer's chances for recovery and that the setoff fails to take his lost chance of survival into account, in order to reverse on this basis we would have to find that it was error as a matter of law for the trial court not to provide for this continuum. The pleadings against all parties allege death—not lost chance of recovery—as the injury, and there were no jury instructions on this alleged lost chance of recovery. We therefore cannot say as a matter of law that it was error for the court not to provide for damages according to Mr. Palmer's lost chance of recovery.

9. In her amended complaint in Hendricks Superior Court, Palmer sought damages against CNS and Dr. Muckway for the following: the death of her husband; hospital and medical expenses; funeral and burial expenses; loss of consortium; lost income; loss of love and affection; loss of parental guidance; costs of estate administration; and mental anguish. In that complaint Palmer also sought damages against the settling parties for the following: wrongful death of Mr. Palmer; additional hospital and medical expenses; funeral and burial expenses; loss of love and affection; lost earning capacity; loss of consortium; loss of parental guidance; costs of administration; and mental anguish.

Further, while neither settling party indicated upon settling that it was admitting fault, the settlement agreements, which provided for full discharge of Palmer's claims, were in direct response to Palmer's specific claim against both settling parties for the "wrongful death" of Mr. Palmer and damages resulting therefrom. This, together with our observation that the settlement amounts were not nominal, serves to further support the trial court's finding that the settlements in this case served as compensation for Mr. Palmer's death. As the jury's award of damages against CNS and Dr. Muckway also served as compensation for damages arising out of the injury of death suffered by Mr. Palmer, we are unable to conclude that the trial court erred in awarding setoff to prevent a double recovery.[10]

We recognize, as Palmer argues and our Supreme Court stated in *Mendenhall,* that settlement payments may arguably cover expenses other than the damages sought by a plaintiff for the injury alleged.[11] Settlements reflect many considerations, among them the parties' desire to avoid the expense and effort of litigation and the tactical effect of eliminating a defendant and its counsel from trial. *R.L. McCoy, Inc.,* 772 N.E.2d at 990. Indeed, in the instant case, one of the settling parties indicated that, among other things, it was purchasing confidentiality. In spite of the many functions of a settlement, however, the common law permitting setoffs remains, and the trial court in the case at hand, in permitting setoff, determined that the settlement payments served as the same compensation of damages as the jury's verdict. It is the trial court's duty to reduce jury verdicts by amounts received in settlement to ensure that a plaintiff not receive more than a full recovery. *Huffman,* 588 N.E.2d at 1267. As the record in this case supports the trial court's conclusion that both the settlements and the verdict covered the injury of Mr. Palmer's death, we cannot say that the trial court erred in determining that CNS and Dr. Muckway met their burden on this issue.

## II. *Additur*

■ Palmer's next claim is that the trial court erred in denying her claim for *additur* in light of what she claims was uncontroverted evidence of damages far in excess of the jury's award. A trial court has broad discretion to correct error. *Hockema v. J.S.,* 832 N.E.2d 537, 541 (Ind. Ct.App.2005), *trans. denied.* We review a trial court's decision to grant a motion to correct error for an abuse of discretion, and reversal will only lie when the trial court's decision was against the logic and effect of the facts and circumstances before it, together with the inferences that may be drawn therefrom. *Id.* Additionally, a trial court's abuse of discretion may result when its decision is without reason or is based upon impermissible considerations. *Id.*

10. Consistent with the damages alleged in the complaint, the jury was instructed that, upon a finding of liability, Palmer was entitled to recover damages resulting from Mr. Palmer's death, including medical and hospital services; funeral and burial expenses; loss of the pecuniary benefit of Mr. Palmer; loss of consortium; loss of love and affection; and loss of parental guidance.

11. Our decision herein does not foreclose the possibility that a settlement agreement would specify the elements and corresponding monetary amounts covered. In such a case, courts would be able to affirmatively know whether and in what amount a settlement served to compensate the same damages a jury's verdict compensates and would only be required to set off from the jury verdict that specific amount which represents double compensation.

Palmer argues that the trial court abused its discretion by denying her motion for additur or a new trial on the issue of damages. Indiana Trial Rule 59(J)(5) provides the following in pertinent part:

"The court, if it determines that prejudicial or harmful error has been committed, shall take such action as will cure the error, including without limitation the following with respect to all or some of the parties and all or some of the errors:

* * *

(5) In the case of excessive or inadequate damages, enter final judgment on the evidence for the amount of the proper damages, grant a new trial, or grant a new trial subject to additur or remitter...."

 We use a strict standard when reviewing a claim that an award of damages is inadequate, and we will neither reweigh evidence, nor judge witness credibility. *Manzo v. Estep*, 689 N.E.2d 474, 475 (Ind.Ct.App.1997). We consider only the evidence favorable to the award. Id. In addition, we must not reverse a damage award so long as the damages fall within the scope of the evidence. Id. at 476. A verdict will be reversed only upon a finding that, based upon the evidence, the amount of damages awarded indicates that the jury was motivated by prejudice, passion, partiality, corruption, or consideration of some improper element. Id. Where the evidence presented is conflicting as to the nature, extent, and source of the injury, the jury is in the best position to assess damages, and we will not disturb the award. Id.

In requesting additur or a new trial on the issue of damages, Palmer claimed that the uncontroverted evidence at trial demonstrated damages amounting to $1,070,196, and that the jury verdict in the amount of $375,000 fell far short of that amount. Palmer therefore requested the trial court to award an additur in the sum of $695,196 or to order a new trial on the basis that the damages were inadequate. CNS and Dr. Muckway respond that they contested the value of Mr. Palmer's future earnings and household services, as well as his life expectancy and work-life expectancy, all factors which the jury could consider in reducing the award from the maximum requested by Palmer.

Contrary to Palmer's claim upon appeal, the evidence establishing damages in the amount of $1,070,196 was not "uncontroverted." Upon cross-examination of Palmer's expert witness, Dr. George Launey, regarding the monetary loss suffered as a result of Mr. Palmer's death, defense counsel pointed out that Dr. Launey had included as part of "lost earnings" Mr. Palmer's earnings as an elected official of Hendricks County for sixteen years. Dr. Launey testified that whether or not Mr. Palmer had continued to serve as an elected official, his earning capacity included the amount of the Hendricks County income. The jury would have been free to determine that Mr. Palmer would not fulfill his maximum earning capacity for the rest of his work-life expectancy as such capacity was measured, in part, by an elected position. Defense counsel also questioned Dr. Launey's calculation of Mr. Palmer's work-life expectancy, which was based upon the life expectancy of an average person rather than an individual with a diagnosis of multiple sclerosis. Dr. Launey's calculation further did not take into account the fact that Mr. Palmer had been in a state of status epilepticus for approximately one hour before Dr. Muckway arrived to treat him. Based upon the evidence and the Medical Review Panel's finding of negligence only as to the treatment of the status epilepticus and not as

to the original multiple sclerosis diagnosis, the jury may have concluded that Palmer's damages arose solely out of the negligent treatment of his status epilepticus. If the jury had so found, it would have assessed Mr. Palmer's life and work-life expectancy as significantly reduced in comparison to the sums suggested by Dr. Launey, and the value of his resulting lost earnings and household services contributions would similarly have been significantly reduced. Accordingly, we conclude that the jury's verdict and assessment of damages was within the permissible range and that the trial court did not abuse its discretion in refusing additur or to grant a new trial on the issue of damages.

### III. *Prejudgment Interest*

Palmer agrees that, if setoff applies and the damages awarded against CNS and Dr. Muckway equal zero dollars, she is not entitled to prejudgment interest. Having determined that the trial court did not err in awarding setoff, and recognizing that the resulting damages against CNS and Dr. Muckway equal zero dollars, there shall be no award of prejudgment interest.

The judgment of the trial court is affirmed.

ROBB, J., and BARNES, J., concur.