**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

**FILED**

Dec 27 2013, 10:20 am

*[signature]*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**DAVID J. MALLON, JR.**
**SEAN T. DEVENNEY**
Drewry Simmons Vornehm, LLP
Indianapolis, Indiana

**JENNY R. BUCHHEIT**
Ice Miller LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**NATHANIEL LEE**
**LAURA CROWLEY**
Lee & Fairman, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| CLARIAN HEALTH PARTNERS, INC., d/b/a METHODIST HOSPITAL, | ) ) ) | |
| Appellant-Defendant, | ) ) | |
| vs. | ) ) | No. 49A02-1211-CT-943 |
| JESSICA SPRUNGER, as next best friend of JAMES DANIEL SPRUNGER, Minor, | ) ) ) ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Patrick L. McCarty, Judge
Cause No. 49D03-0809-CT-41343

**December 27, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

Clarian Health Partners, Inc. d/b/a Methodist Hospital (Clarian)[1] appeals from the jury's verdict in favor of James Daniel Sprunger (James) in a medical malpractice action brought by Jessica Sprunger (Jessica), as best friend of James, against Clarian.[2] The trial court entered judgment on the verdict in favor of James, less an offset for an amount previously paid, and denied Clarian's subsequent motion to correct error. Clarian appeals, raising the following consolidated and restated issues for our review:

1. Did the trial court abuse its discretion by denying Clarian's motion to correct error alleging that the jury's verdict was excessive and not supported by the evidence?

2. Did the trial court err by giving or failing to give certain proposed issue instructions and proposed final instructions?

James cross-appeals, raising this additional issue for our review:

3. Was the trial court's offset of damages previously paid contrary to our Supreme Court's comparative fault analysis in *Mendenhall v. Skinner*, 728 N.E.2d 140 (Ind. 2000)?

We affirm in part, reverse in part, and remand.

James was born prematurely on August 27, 2006, during the twenty-seventh week of gestation, and was immediately taken to the Neonatal Intensive Care Unit (NICU) at Clarian. While in the NICU, on September 16, 2006, James received an over-administration of the

---

[1] "Clarian Health Partners no longer exists—it is now known as IU Health, Inc. However, to be consistent and to avoid confusion, for purposes of this appeal, Clarian Health Partners d/b/a Methodist Hospital will be referred to as 'Clarian.'" *Appellant's Brief* at 2 n.1. We, too, will refer to Clarian Health Partners d/b/a Methodist Hospital as "Clarian."

[2] James's complaint had also named Baxter Health Corporation (Baxter) along with Clarian as a defendant. Baxter settled with Cynthia Sprunger (Cynthia), who is James's maternal grandmother, Jessica, who is James's mother, and James through alternative dispute resolution, was dismissed from the proceedings, and is not a party to this appeal. The fact of this settlement was not revealed to the jury.

drug Heparin, an anti-coagulant. James suffered from transient coagulopathy, or "a short-term abnormality in the blood clotting system of the baby." *Transcript* at 260. James was discharged from Riley Hospital on February 6, 2007.

A Medical Review Panel considered the proposed complaint alleging medical malpractice brought by Cynthia, Jessica, and James, and determined that Clarian "failed to comply with the appropriate standard of care as charged in the complaint. The conduct complained of was a factor of the resultant damages (transient coagulopathy), but the patient, [James], did not suffer any disability or permanent impairment." *Plaintiff's Exhibit* 2. Thereafter, Jessica filed a complaint on behalf of James alleging, in pertinent part, medical malpractice against Clarian, and Jessica and Cynthia filed separate claims for emotional distress. Both sides filed motions for partial summary judgment, and the trial court granted Clarian's motion after holding a hearing during which the parties stipulated to Clarian's admission of negligence. The trial court's order reflecting that stipulation of partial summary judgment reads in part as follows:

> 1. With respect to the care and treatment rendered to James Daniel Sprunger by Clarian from the time of his birth on August 17, 2006, until his discharge from Riley Hospital on February 6, 2007, Clarian's treatment fell below the applicable standard of care only with respect to the over-administration of Heparin to James Daniel Sprunger on September 16, 2006. All other aspects of the care and treatment rendered by Clarian during this time period complied with the applicable standard of care;
>
> 2. The only injury resulting to James Daniel Sprunger from Clarian's negligent administration of Heparin was transient coagulopathy, which lasted less than twenty-four (24) hours and caused no further injury to James Daniel Sprunger; and

3. James Daniel Sprunger's subsequent development of necrotizing enterocolitis was not causally related to the overdose of Heparin or any other aspect of the treatment rendered to James Daniel Sprunger from the time of his birth on August 17, 2006, until his discharge from Riley Hospital on February 6, 2007.

*Appellant's Appendix* at 21-22.

The trial court initially denied Clarian's motion for partial summary judgment on Cynthia and Jessica's separate claims for emotional distress. After reconsidering its ruling, the trial court later granted Clarian's motion and entered judgment in favor of Clarian as to Cynthia's and Jessica's claims. After denying Jessica's and Cynthia's motion to correct error, the trial court granted Clarian's motion to modify the caption of the lawsuit to remove Jessica's and Cynthia's claims.

The three-day jury trial on James's claim began on May 22, 2012. At the conclusion of the trial, the jury returned a verdict awarding $500,000 in damages in favor of James. Clarian filed a motion to set off the amount[3] received in settlement from Baxter. After holding a hearing, the trial court granted Clarian's motion and entered a reduced judgment in favor of James and against Clarian in the amount of $480,000. Clarian filed a motion to correct error contending that the trial court should reduce the jury's verdict or, in the alternative, order a new trial. The trial court denied Clarian's motion to correct error. Clarian now appeals and James cross-appeals.

---

[3] Jessica received $20,000 from Baxter and James received $20,000 from Baxter pursuant to their settlement agreement, for an aggregate settlement of $40,000. Because James's claim was the only claim at issue at trial, Clarian sought to set off the amount James received from Baxter, $20,000.

4

1.

Clarian first argues that the jury's verdict is not supported by the evidence and that the trial court abused its discretion by denying Clarian's motion to correct error. Generally, this court reviews a trial court's ruling on a motion to correct error for an abuse of discretion. *City of Indianapolis v. Hicks*, 932 N.E.2d 227 (Ind. Ct. App. 2010). The abuse of discretion standard of review is appropriate in this challenge because the challenge does not involve a pure question of law, which would require *de novo* review on appeal. *Id.* Here, the motion to correct error was based upon the argument that the jury's compensatory damages award was excessive such that it was inappropriately punitive and not supported by the evidence. Clarian asked for a reduction of the compensatory damages award to conform to the evidence or, in the alternative, a new trial to determine those damages.

When a jury's compensatory damages award is challenged as being excessive we apply the following standard of review:

> We will set aside an award of compensatory damages as impermissibly excessive where it is apparent from a review of the evidence that the amount of damages is so great it cannot be explained upon any basis other than passion, partiality, prejudice, corruption, or some other improper element. The jury's damage award will not be deemed the result of improper considerations if the size of the award can be explained on any reasonable ground. Further, when the evidence concerning the injury and damages is conflicting, the jury is in the best position to assess the damages and the jury's verdict cannot be said to be based upon prejudice, passion, partiality, corruption, or on the consideration of some improper element.

*Berman v. Cannon*, 878 N.E.2d 836, 840 (Ind. Ct. App. 2007) (internal quotations and citations omitted). Also instructive here is the following analysis of the proof required where a plaintiff alleges personal injuries in such cases:

> The necessity of expert medical testimony to establish a causal connection generally depends upon the nature of the medical question involved. Thus, expert testimony is required where the question involves medical factors beyond the common knowledge of the layman such that the jury could only indulge in speculation in making a finding based thereon. However, on medical matters which are within the common experience, observation, or knowledge of laymen, no expert testimony is required to permit a conclusion on causation.

*Willis v. Westerfield*, 839 N.E.2d 1179, 1188 (Ind. 2006) (quoting *Johnson v. Bender*, 174 Ind. App. 638, 644, 369 N.E.2d 936, 940 (1977), *trans. denied*)).

Clarian contends that the judgment must be reversed because there was no expert medical evidence that the over-administration of Heparin caused James to have any significant injury such that a $500,000 damages award was supported. The chronological case summary (CCS) indicates that James filed a motion for partial summary judgment and memorandum in support of that motion. On May 28, 2010, Clarian filed a motion for partial summary judgment in which it admitted negligence in giving James too much Heparin on September 16, 2006, but argued that the expert testimony in Clarian's designated evidence established that Clarian's negligence did not cause any permanent injury as claimed by Jessica on James's behalf. Clarian designated the affidavit of Dr. Clark E. Kramer, a pediatric hematologist and oncologist, who served on the Medical Review Panel that reviewed James's claim, in which he stated that in his opinion, Clarian's negligence was limited to the administration of too much Heparin on September 16, 2006, but that negligence did not cause any permanent injury to James. Dr. Kramer stated that he did not believe that Clarian deviated from the standard of care with respect to any other aspect of James's care and treatment, including James's feeding, which also was alleged in the

6

complaint to have been negligently provided. James did not designate any evidence opposing the opinion of Dr. Kramer. Thus, after the entry of the stipulation of partial summary judgment, the issue was narrowed to James's damages resulting from the transient coagulopathy lasting less than twenty-four hours.

The trial court granted James's requests for additional time in which to disclose his expert witnesses, with the last extension providing for disclosure until November 16, 2010. On November 1, 2010, James tendered an expert disclosure listing the members of the medical review panel and three additional witnesses: 1) Shelvy Keglar, Ph.D., 2) Dr. Debra Carter-Miller, M.D., and 3) Dr. Joye Carter, M.D. After the names of the three additional witnesses were brief summaries of the expected testimony of each witness.

> 4. Shelvy Keglar, PhD may testify as to his evaluation of James Daniel Sprunger and long term condition and referral for treatment program for infants and young children;
>
> 5. Dr. Carter-Miller may testify as to James Daniel Sprunger's current condition and her evaluation;
>
> 6. Joye Carter, M.D. will testify that James Daniel Sprunger suffered complications of Heparin overdose which was[sic] not considered at the time or dispersed throughout the medical record to avoid association. The HIT syndrome is a known complication of Heparin administration with Heparin induced thrombocytopenia and/or thrombosis. James Daniel Sprunger suffered a thrombotic event in his abdomen and had to undergo extensive surgery after the Heparin overdose. James Daniel Sprunger received Protamine Sulphate to reverse the effects of the overdose of Heparin he received intravenously at 1000 x the dose and that the timing of the overdose of Heparin treatment with Protamine Sulphate was the cause or substantial contributing factor in the development of the NEC.

*Appellee's Appendix* at 21. Clarian filed motions in limine to prevent the testimony of those additional witnesses because their testimony would have gone beyond the scope of the issue

7

and injury defined in the stipulation of partial summary judgment. Those motions in limine were granted by the trial court.

During the plaintiff's case-in-chief, the videotaped testimony of Dr. Martin Vincent was offered. Dr. Vincent had served on the medical review panel in this case and testified that James did not suffer any permanent injuries as a result of the over-administration of Heparin. He opined that Clarian's negligent conduct was a factor in James's condition, transient coagulopathy, but that James did not suffer any disability or permanent impairment as a result. Dr. Vincent observed that Clarian performed several tests on James's blood after the discovery of the over-administration to determine James's reaction to the Heparin and to the various medications and agents used to counteract the Heparin. Dr. Vincent reaffirmed that the coagulopathy lasted approximately twenty-four hours and an ultrasound of James's brain found no bleeding or other abnormality of any kind. Dr. Vincent further testified that "There is a treatment, but it does go away on its own fairly rapidly. Half-life of Heparin is about 90 minutes, so the effect will go away fairly quickly." *Plaintiff's Exhibit* 6 at 19.

Next, with respect to expert testimony, Dr. Ilana Torine testified during Clarian's case-in-chief. Dr. Torine was the neonatologist who was responsible for the NICU on September 16 and 17, 2006, and cared for James on those dates. After she was informed about the over-administration of Heparin, Dr. Torine's main concern was bleeding. James was assessed to determine if he had any problems breathing, with his heart rate, or with any of his vital signs, and there were no problems. Dr. Torine ordered coagulation studies and a complete blood count for James on the afternoon of September 16. Those tests results

reflected that they were "abnormal", indicating that James's bleeding or clotting time was prolonged. *Transcript* at 128.

Dr. Torine was the person who ordered the head ultrasound for James on September 16 to make sure that he did not have any bleeding in his brain since that is one of the first places bleeding can occur in a premature baby. The ultrasound indicated that there was no bleeding in James's brain. Additionally, Dr. Torine ordered repeat blood tests on the evening of September 16 and the afternoon of September 17. According to Dr. Torine, the aspects measured by those blood tests were normal by the evening of September 16 and remained normal on September 17. Dr. Torine agreed with Dr. Vincent's opinion that James's transient coagulopathy lasted 24 hours.

Dr. Torine also testified that during a physical examination of James on September 16, she noticed that there was a small amount of blood mixed with saliva, approximately less than half a teaspoon of fluid, around James's mouth. She testified that this was the only evidence of bleeding that she saw on September 16, and that no one reported any evidence of bleeding to her after her observation. She saw no evidence of bleeding on September 17.

Further monitoring of James on September 16 and 17 revealed that James's vital signs were as they should have been and there was no blood in James's urine or stool. When Dr. Torine's duties in the NICU ended on September 17, James was stable, there was no bleeding, he was not experiencing any changes in heart rate, and his vital signs were stable.

Dr. Kramer, the pediatric hematologist and oncologist who had also served on the medical review panel testified during Clarian's case-in-chief at trial. Dr. Kramer testified

that James did not suffer any long-term effects as a result of the over-administration of Heparin. He agreed with the characterization of James's transient coagulopathy during the relevant period of time as "something that exists but has not yet caused a problem." *Id*. at 263.

During his testimony, Dr. Kramer reviewed James's blood tests from September 16 and 17 and explained how they were very abnormal on the afternoon of September 16, but by that evening were normal for a premature baby. The test results remained normal on September 17. James's tests showed that he was not exhibiting any signs of bleeding, his vital signs were stable, and he was reacting normally to stimulation in the nursery. Dr. Kramer further testified that James's abnormal blood tests did not mean that there was an injury, that there was bleeding, or that James experienced pain. He stated that one can have a transient coagulopathy and not manifest any problems. Here, the evidence of James's coagulopathy was the abnormal blood test. In addition, he cited to the ultrasound of James's head, which reflected that there was no evidence of intracranial bleeding. This was important, because the brain is one of the first places they would look for evidence of bleeding, since that is the location where the most damage could be done.

Dr. Kramer was also asked about what affect if any there would be in terms of James's treatment given that James received three doses of the incorrect concentration of Heparin. He testified that James's treatment, which involved being given Protamine to counteract the effects of Heparin, and fresh frozen plasma, to replace the clotting factors inactivated by the Heparin, would counteract the over-administration of Heparin. This treatment was not

dictated by how many improper doses James received. He indicated that in his opinion, to a reasonable degree of medical certainty, James did not incur or suffer any injury or harm to his body as a result of the transient coagulopathy he experienced after the over-administration of Heparin on September 16. He further stated that the blood drawn from James on September 16 and 17 for the blood tests and which amounted to approximately 1.5 to 3.0 milliliters, was a meaningful loss of blood. His opinion was not altered by the discovery of blood in James's mouth, nor an arterial stick[4] noted by one of the nurses on the afternoon of September 16. He believed that the blood in the mouth could have been caused by irritation from a tube in James's nose, and the arterial stick quickly stopped bleeding and did not cause any other injury.

Dr. Veronica Guilfoy, a neonatologist who was working in Clarian's NICU in September 2006, testified during Clarian's case-in-chief. Clarian had not intended to use Dr. Guilfoy's testimony because James was in her care on September 18, 2006, outside the pertinent time period defined in the stipulation of partial summary judgment. During James's case-in-chief, Cynthia and Jessica were allowed to testify about their observations of James's condition. Although both women testified in depositions that they recalled seeing blood around James's nose and mouth on September 16, 2006, they testified at trial that they believed their observations may have been made on September 18, 2006.

---

[4] "An arterial stick is the collection of blood from an artery for laboratory testing." http://umm.edu/health/medical/ency/articles/arterial-stick. (last visited on December 6, 2013).

11

Dr. Guilfoy stated that, in her opinion, James did not suffer from any effects from the over-administration of Heparin. She testified that during her time in the NICU on September 18, 2006, which was from approximately 8:00 a.m. until 4:00 p.m., she did not observe any bleeding or bruising on James, nor did any of the nurses or residents report to her that James had any bruising or bleeding. To her recollection, James "was actually very stable, he was tolerating his feedings, and we had no indication that he was having any problems." *Id*. at 245.

We reject James's argument that the trial court erred by limiting James's use of the proffered expert testimony in light of Clarian's alleged violation of its own motion in limine. Clarian was allowed to rebut Jessica's and Cynthia's testimonies, to the extent they claimed their observations were made on September 18, with Dr. Guilfoy's observations from that date. Further, that testimony did not open the door to the admission of James's excluded expert medical testimony. Each of those witnesses were expected to testify about James's current condition or physical health, clearly beyond the pertinent time frame at issue.

There was no evidence introduced at trial that Cynthia or Jessica had hospital expenses related to James's care. In fact, there was evidence that Clarian wrote off James's hospital expenses. Further, there was no evidence that Jessica was claiming any loss of wages related to James's injuries. The expert medical testimony demonstrated the seemingly unanimous opinion that James did not suffer any injury or harm to his body as a result of the transient coagulopathy he experienced after the over-administration of Heparin on September 16. So, what was the source of the jury's award of $500,000? Based upon the record before

12

us we cannot conclude that the jury's award was rooted in anything other than passion, partiality, prejudice, or some other improper element, and that James asked for that amount in closing argument. The trial court erred by denying Clarian's motion to correct error.

2.

Our resolution of the previous issue has support in our review of the challenges made to the jury instructions, which are pertinent to our review in the event this matter proceeds to a new trial. Clarian first contends that the trial court erred by giving James's proposed issue instruction and failing to give Clarian's proposed issue instruction. In challenges to instructions either given or refused, our standard of review, which follows, is well settled:

> In reviewing a trial court's decision to give or refuse a tendered instruction, this Court considers whether the instruction (1) correctly states the law, (2) is supported by the evidence in the record, and (3) is covered in substance by other instructions. The trial court has discretion in instructing the jury, and we will reverse on the last two issues only when the instructions amount to an abuse of discretion. The selection of instructions is left to the sound discretion of the trial court so long as the instructions as a whole accurately and completely set forth the elements of the parties' claims and defenses.

*Swan Lake Holdings, LLC v. Hiles*, 888 N.E.2d 265, 273 (Ind. Ct. App. 2008) (quoting *Willis v. Westerfield*, 839 N.E.2d 1179, 1189 (Ind. 2006) (citation omitted)) (internal footnote omitted).

The trial court gave the following issue instruction to the jury:

> Plaintiff claims that the hospital staff improperly administered medication to the infant child on or about September 16, 2006.

> The Defendant admits that they improperly administered Heparin to the infant but they deny the nature and extent of injuries caused by the administration of Heparin.

13

Plaintiff has the burden to prove their claim by the preponderance of the evidence. Defendant has no burden to disprove its'[sic] claim by the Plaintiff; as already stated, it is the burden of the Plaintiff to prove the claim.

*Appellant's Appendix* at 27. Clarian submitted its own proposed issue instruction, which the trial court refused to give, that reads as follows:

On August 17, 2006, James Daniel Sprunger was born at Methodist Hospital in Indianapolis. James was born at 27 weeks gestation—or approximately 13 weeks prematurely. After he was born, he was a patient at Methodist's Neonatal Intensive Care Unit—or NICU.

On September 16, 2006, James was given three flushes of the drug Heparin through his PICC line, which is a type of IV. On all three occasions, the concentration of Heparin in the flush far exceeded the concentration that should have been used. This incorrect concentration of Heparin was the result of system errors by Methodist. Clarian—of which Methodist is a part—has admitted that these errors were negligent, and that Clarian is responsible for this negligence. James' mother, Jessica Sprunger, brought this lawsuit on James' behalf, seeking damages allegedly occurring to James as the result of Clarian's negligence in administering an incorrect concentration of Heparin.

On August 24, 2010, the Court entered a partial summary judgment order. The Court determined that Clarian was negligent with regard to the September 16, 2006 over-administration of Heparin to James. The Court also determined that all other aspects of the care and treatment Clarian rendered to James during this time period complied with the applicable standard of care. The Court also determined that "the only injury resulting to James Daniel Sprunger from Clarian's negligent administration of Heparin was transient coagulopathy, which lasted less than 24 hours and caused no further injury to James Daniel Sprunger." Transient coagulopathy is a medical term for a temporary disturbance of the blood's ability to clot.

Clarian has admitted that it was negligent with regard to the over-administration of Heparin, and the Court has determined that it was in fact negligent on this aspect of James' care only. The only issue for you to decide in this case is what damages, if any, James is entitled to recover for the transient coagulopathy which lasted less than 24 hours.

*Id*. at 30-31.

14

The trial court initially found Clarian's issue instruction to be more strongly worded than the proposed issue instruction tendered by James because it included language about Clarian's admission, but then opined that it would be better to provide the substance of Clarian's proposed issue instruction in the final instructions. Clarian argued that the instruction should be given as an issue instruction because the jury needed to know early on that the issues had been narrowed over the course of litigation. The trial court stated that Clarian's issue instruction had so many facts pertaining to court procedure, i.e., references to partial summary judgment, that the jury would be further confused about its role. James's counsel asserted that Clarian's proposed issue instruction contained Clarian's argument and was not proper as an instruction. The trial court gave James's issue instruction over Clarian's objection.

Clarian asserts that the trial court erred by failing to instruct the jury at the outset about the limitations on what it was to decide—the damages, if any, that should be awarded to James for the transient coagulopathy that lasted less than 24 hours—but the jury was given the instruction during final instructions. We do find compelling Clarian's argument that under Jury Rule 20(a)(8), which allows the jury to discuss evidence during recesses at trial, as long as all jurors are present, and no verdict is reached, the sooner the jury is focused on its task the better. While that tack may appear to be preferable, we cannot say that the trial court erred by its choice of the appropriate time to give the instruction to the jury, and acknowledge that there are no cases to support the argument that the trial court's choice here was in error.

Clarian further contends that the trial court erred by giving Final Instruction 9. That instruction reads as follows:

> If a health care provider's negligent conduct makes it uncertain whether his patient would have had a different outcome had the patient received proper care and treatment, the health care provider should not be given the benefit of the uncertainty its'[sic] negligence created. If you find that Methodist Hospital was negligent and that their negligence makes it uncertain whether James Daniel Sprunger could have obtained better results if he had received proper care, then you should not give the Defendants [sic] the benefit of the uncertainty Methodist Hospital's negligence created.

*Appellant's Appendix* at 35 (citing *Mayhue v. Sparkman*, 653 N.E.2d 1384 (Ind. 1995) and *Smith v. Washington, M.D.*, 716 N.E.2d 607 (Ind. Ct. App. 1999), *trans. granted on other grounds*)). The substance of this instruction involves the concepts of the loss-of-chance doctrine, and increased risk of harm, which have been described in conjunction with the holding in *Mayhue* as follows:

> Mayhue explicitly pointed out that it dealt with a claim for a patient who had died, allegedly as the result of negligent treatment. Because the patient in Mayhue was seriously ill before treatment, the case addressed whether a plaintiff may maintain a cause of action for medical malpractice even though traditional causation standards may not be satisfied. In contrast, here the issue is whether a reduced chance of survival, which mathematically equates to a decrease in life expectancy, is itself a compensable injury. If it is, a plaintiff may recover for this injury, independently of whether the plaintiff has or has not actually beaten the odds to date.
>
> Causation and injury are sometimes described together as the collective third element of a medical malpractice claim. Causation and injury are distinct, however, and we are confronted with this distinction here.
>
> We think that loss of chance is better understood as a description of the injury than as either a term for a separate cause of action or a surrogate for the causation element of a negligence claim. If a plaintiff seeks recovery specifically for what the plaintiff alleges the doctor to have caused, i.e., a decrease in the patient's probability of recovery, rather than for the ultimate

outcome, causation is no longer debatable. Rather, the problem becomes one of identification and valuation or quantification of that injury.

*Alexander v. Scheid*, 726 N.E.2d 272, 275 (Ind. 2000) (internal citation and parenthetical omitted).

In addition, we stated the following in *Wolfe v. Estate of Custer ex rel. Custer*, 867 N.E.2d 589, 596 n.6 (Ind. Ct. App. 2007):

> The 'pure loss of chance' doctrine compensates for the loss of the chance itself and not for the plaintiff's physical injury that was incurred but likely even before the defendant's act or omission. Under the loss of chance doctrine, "[t]he compensable injury is not the result, which is usually death, but the reduction in the probability that the patient would recover or obtain better results if the defendant had not been negligent. The Indiana Supreme Court has distinguished §323 from the loss of chance doctrine by explaining that §323 "deal[s] with claims for increased risk for an injury that has been incurred" while the loss of chance doctrine applies "where, although the risk had been increased, the plaintiff's ultimate injury was uncertain."

(internal citations omitted).

Here, Clarian's challenge to the trial court's decision to give the instruction is based in large part on the premise that there is no evidence in the record to support giving the instruction. We note that the jury was asked to determine compensatory damages, not punitive damages. The expert medical testimony established that Clarian's negligence in the over-administration of Heparin caused James to experience transient coagulopathy lasting less than 24 hours. The expert medical testimony restated in detail above established that James suffered no significant injury, he suffered no permanent injury, and did not suffer any disability or permanent impairment from the transient coagulopathy. The expert medical testimony consistently reflected the opinion that James's transient coagulopathy lasted at

most twenty-four hours and had stabilized and resolved by that time. Thus, the jury was asked only to determine the amount of compensatory damages James was entitled to recover for any injury during that twenty-four-hour period. The jury was presented with evidence of the testing James underwent, including blood draws and an ultrasound of his head, and testimony about any bleeding that was reported during the pertinent time frame. We agree with Clarian that the evidence did not support the decision to give this instruction because it caused the jury to speculate on awarding damages for a reduced chance of survival, an issue beyond the scope of the jury's function.

Clarian also challenges the trial court's decision to give Final Instruction 12, which reads as follows:

> The patient-hospital relationship is one in which the patient trust[s] the hospital, because the patient lacks the knowledge, skill, and experience of the hospital and its staff in those subjects which are vitally important to the patient. A patient has a right to rely upon the staff at Methodist Hospital.

*Appellant's Appendix* at 36. This instruction appears to be relevant in the context of a negligence analysis, but that analysis is unnecessary here. The trial court had already entered partial summary judgment establishing negligence, leaving the issue of damages to the jury. The trial court abused its discretion by giving this instruction.

The cases cited by the committee that prepared the model instruction that served as the basis for or Instruction Number 12 each were concerned with the issue of fraudulent concealment and the effect of fraudulent concealment on the appropriate statute of limitations, issues not before the jury here. *See Umolu v. Rosolik*, 666 N.E.2d 450, 453 (Ind. Ct. App. 1996) ([t]he doctrine of fraudulent concealment tolls the statute of limitations in

18

certain circumstances. It operates to estop a defendant from asserting a statute of limitations defense when that person, by deception or violation of a duty, conceals material facts from the plaintiff to prevent discovery of the wrong"); *Ott v. Weinstock*, 444 N.E.2d 1227, 1236 (Ind. Ct. App. 1983) (from termination of physician-patient relationship, the duty to disclose ends, and there is no longer a fraudulent concealment, thus causing the statute to no longer be tolled); *Adams v. Luros*, 406 N.E.2d 1199, 1201 n.1 (Ind. Ct. App. 1980) (fraudulent concealment that tolls the statute of limitations is not a "legal disability" for purposes of determining statutory period for bringing medical malpractice action).

The subjects of negligence and fraudulent concealment clearly had no place in this jury trial concerned only with the determination of a damages award, if any. James argued during the trial and reiterates the argument on appeal that the physicians and staff at Clarian altered documents pertaining to James's care and fraudulently concealed the precise nature of Clarian's negligence to Jessica and Cynthia. None of this discussion was or is relevant to the determination of *compensatory damages*, the only issue before the jury.

Furthermore, to the extent James argues that Jessica had the right to rely on Clarian's staff's treatment of James, this issue is also irrelevant to the present case. Jessica's independent claim for emotional distress was dismissed prior to trial. Her right to rely on Clarian's staff had no bearing on the issue of the amount of damages James should recover.

Clarian also challenges the trial court's decision to give Final Instruction 8, contending that it is not supported by the evidence in the record. The instruction as given reads as follows:

A person, feeble or strong, young or old, is entitled to recover full compensation for the injuries actually sustained by the negligent acts of a defendant. The law provides that a wrongdoer takes a plaintiff as he finds him, with all of his illnesses and infirmities of body, and the defendant may be held responsible in damages for aggravating a previous physical condition.

Even if you find from the evidence that, because of a prior physical condition James Daniel Sprunger may have been susceptible to injury, or that he suffered more because of a prior physical condition, this fact will not prevent the recovery of any and all damages proximately caused by the Defendants'[sic] conduct.

*Appellant's Appendix* at 34 (citing *Indiana Trucking v. Harber*, 752 N.E.2d 168, 172 (Ind. Ct. App. 2001), *Ingersoll-Rand Corp. v. Scott*, 557 N.E.2d 679 (Ind. Ct. App. 1990), and *Skaggs v. Davis*, 424 N.E.2d 137 (Ind. Ct. App. 1981).

In support of giving the instruction, James argued that Jessica and Cynthia testified that James had the appearance of swelling after the Heparin incident. Yet, that observation does not support the argument that James had a prior physical condition exacerbated by the over-administration of Heparin. James argues now that the prior physical condition was James's status as a prematurely delivered baby. There was no expert medical testimony that a prior physical condition was made worse or was aggravated by Clarian's negligence. The sole issue before the jury was what amount of damages James could recover for the condition, transient coagulopathy, which lasted less than twenty-four hours and caused no further injury to him. The trial court abused its discretion by giving the instruction, which likely confused the jury, and which involved matters not supported by the evidence, or properly before the jury to decide.

3.

James cross-appeals contending that the trial court erred by reducing the jury's verdict. James argues that Clarian waived the issue of remittitur by failing to argue an amount of damages at trial. James further asserts that the trial court's reduction of the jury verdict did not comport with our Supreme Court's holding in *Mendenhall v. Skinner*, 728 N.E.2d 140 (Ind. 2000).

James argues that Clarian has waived the issue of remittitur by failing to argue a specific amount of damages to the jury. Indiana Trial Rule 59(J)(5) provides for the granting of relief in a motion to correct error. In particular, it provides as follows:

> The trial court, if it determines that prejudicial or harmful error has been committed, shall take such action as will cure the error, including without limitation the following with respect to all or some of the parties and all or some of the errors:
>
> . . . .
>
> (5) In the case of excessive or inadequate damages, enter final judgment on the evidence for the amount of the proper damages, grant a new trial, or grant a new trial subject to additur or remittitur.
>
> . . . .
>
> In its order correcting error the court shall direct final judgment to be entered or shall correct the error without a new trial unless such relief is shown to be impracticable or unfair to any of the parties or is otherwise improper. . . .

Here, after the jury returned the $500,000 damages award in favor of James, Clarian filed a motion to correct error arguing that the verdict was excessive and suggesting that an award of $40,000 was more appropriate and conformed with the evidence introduced at trial. T.R. 59 explicitly states that a motion to correct error is a prerequisite for an appeal in a case

21

such as this where a party claims that a jury verdict is excessive or inadequate. We agree with Clarian's argument that the appropriate time for raising the issue of remittitur was in its motion to correct error.

> The power of a trial court to grant a remittitur is of ancient origin, and is generally looked upon with favor. It is sanctioned upon the theory that the excess portion of the verdict arises from an error of law, a mistake in computation, or a misapprehension of facts which does not permeate the entire verdict and may therefore be corrected to avoid expensive litigation and unnecessary delays.

*Dahlin v. Amoco Oil Corp.*, 567 N.E.2d 806, 812 (Ind. Ct. App. 1991) (internal citations omitted). The trial court denied Clarian's motion to correct error. James has failed to establish that Clarian waived the issue of remittitur, and consistent with the parties' burdens at trial, Clarian was not required to suggest an appropriate damages award amount.

Clarian also filed a motion for set-off which was granted by the trial court. James contends that this was in error. In *Mendenhall*, 728 N.E.2d 140 (Ind. 2000), an action brought under the Comparative Fault Act, a jury found that the plaintiff was 50% at fault and the remaining defendant was also 50% at fault, leading to a judgment against the defendant in the amount of $40,000, or half the amount assessed in damages. The defendant sought credit against the judgment for money paid to the plaintiff by a settling co-defendant who had not been added back under the nonparty provisions of the Comparative Fault Act. In pertinent part, the trial court granted the motion for the credit and applied the $15,000 settlement against the defendant's judgment. The plaintiff appealed. Our Supreme Court held as a matter of first impression that a credit is only available under the Comparative Fault Act if the defendant names the settling nonparty.

22

Here, however, we are presented with a case arising from the Medical Malpractice Act. "In medical malpractice actions . . . the Comparative Fault Act does not apply. " *Palmer v. Comprehensive Neurologic Servs, P.C.*, 864 N.E.2d 1093, 1098 (Ind. Ct. App. 2007). In *Palmer*, we further cited to our Supreme Court's holding that the common law defense of contributory negligence remains available to defendants in cases involving the allegation of medical malpractice. *Palmer v. Comprehensive Neurologic Services, P.C.*, 864 N.E.2d 1093 (citing *Cavens v. Zaberdac*, 849 N.E.2d 526 (Ind. 2006)). Following the one satisfaction principle, we held that when the actions of joint tortfeasors unite to cause a single injury, a credit is allowed in order to prevent a plaintiff from recovering twice for the same injury. *Id*. Thus, a defendant against whom judgment is entered is entitled to a setoff against the damages in the amount the plaintiff received from any settling joint tortfeasor. *Id*. Our Supreme Court used the same analysis in *Ind. Dep't of Ins. v. Everhart*, 960 N.E.2d 129 (Ind. 2012) ("when a jury returned a verdict against a jointly and severally liable defendant after another jointly and severally liable defendant had already settled in exchange for a covenant not to sue, a court should adjust *pro tanto* the amount of any damages determined by the jury verdict by subtracting any consideration received from the amount of any damages determined by the jury verdict"). This rule, although stated prior to the effective date of the Comparative Fault Act, remains viable in cases involving joint tortfeasors falling outside the Comparative Fault Act. *Id*.

Turning to the present case, James's second amended complaint alleged that Clarian negligently gave James an over-administration of the drug Heparin, resulting in injuries. The

complaint further alleged that Baxter's negligent manufacture of the Heparin which was sold to and utilized by Clarian by packaging it in a condition that was unreasonably dangerous such that the Heparin was improperly administered to James among others. Thus, in this medical malpractice action, which falls outside the Comparative Fault Act, the trial court correctly set off the amount James received in pre-trial settlement from Baxter.

Judgment affirmed in part, reversed in part, and remanded.

BAKER, J., and VAIDIK, J., concur.